UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO. 3:03CR00202(AVC) |
| MIGUEL NUNEZ | : | November 8, 2004 |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The Defendant, Miguel Nunez, respectfully submits this memorandum as an aid to the Court at sentencing.

On July 21, 2003, Mr. Nunez pled guilty to a one count information charging him the possession of one kilogram of heroin with the intent to distribute. His plea stemmed from his involvement as a "runner" for a drug dealer named Javier Echeverri (hereinafter referred to by his nickname "Mono"). Mr. Nunez and his co-defendant had agreed to transfer the heroin from Mono to a cooperating witness. On May 5, 2003, federal agents arrested Mr. Nunez and his co-defendant attempting to deliver the heroin to the cooperating witness.

During the eighteen months since his arrest, Mr. Nunez has been making a sincere effort to atone for his misconduct. A conscientious, family-oriented man, Mr. Nunez knew his involvement in this case went against his better judgment and he has, literally from the moment of his arrest, tried to "right his wrong." Even before he had the opportunity to obtain the advice of counsel, Mr. Nunez offered to assist government agents in their on-going investigation in this case. This included making a phone call to Mono only hours after his arrest so that Mono would not suspect Mr. Nunez' arrest, and thereby allow the government to utilize Mr. Nunez to pursue Mono. Over the next several months, Mr. Nunez worked closely with federal agents in a successful effort to arrest and prosecute Mono.

This cooperation, the details of which the government has set forth in their motion to the Court pursuant to section 5K1.1 of the Sentencing Guidelines, often required Mr. Nunez to travel from his home in New York to Bridgeport, Connecticut, to meet with agents in an effort to coordinate and effect their investigation. Given that Mono was a dangerous drug supplier with associates in the New York

- 2 -

area, Mr. Nunez' assistance in facilitating his arrest put not only himself but also his family in significant danger. On more than one occasion, agents warned Mr. Nunez and his family to be careful, and recommended they stay in their apartment as much as possible. No doubt, Mr. Nunez has lived the last eighteen months constantly looking over his shoulder as a result of his cooperation, and he has literally lost sleep worrying about the danger in which he may have put his family. However, Mr. Nunez appreciates the significance of his misconduct in this case, and honestly believes his cooperation was the appropriate way in which to remedy his wrongdoing.

Apart from his cooperation, Mr. Nunez has also demonstrated impeccable compliance with the terms of his pretrial release. Understanding that it was his misconduct, alone, that created the need for his supervision, Mr. Nunez saw it as his duty to be as compliant as possible while on release, and also viewed his release as yet another opportunity to compensate for his misconduct. To this end, Mr. Nunez vigorously sought to maintain employment while released, and meticulously honored his reporting requirements, such that the probation office saw no need to keep him on electronic monitoring. Mr. Nunez' performance while on release represents just how keenly aware he is of the significance of his wrongdoing and the sincerity of his efforts to atone for his crime.

There is no doubt that, a first glance, Mr. Nunez' background does not provide an explanation for his behavior in this case, and might lead one to question how and why he would engage in such conduct. As the presentence report articulates, Mr. Nunez came from a large yet close family of nine brothers and sisters. His parents were nurturing and compassionate people, and it is evident from the way Mr. Nunez interacts with his own family, that he learned many virtuous traits from his parents. The outpouring of support from family members in the myriad letters presented to the Court in this case gives some indication of the high esteem his family holds for Mr. Nunez, and is a reflection of the compassion, love, and concern Mr. Nunez has for his family. While Mr. Nunez has enjoyed the benefit of a loving family throughout his years, a major event occurred early in Mr. Nunez' life that had a serious affect on the direction of his life, and set him on a path that ultimately led to the instant offense.

Mr. Nunez was in a serious car accident at the age of eighteen. He was hospitalized for nearly

- 3 -

one month after this incident, and suffered serious side effects such as migraine headaches for a long time to follow. The effects of the accident disrupted Mr. Nunez' schooling, and despite efforts to return to school at later times, Mr. Nunez has never been able to achieve the level of education he intended to achieve before the accident. This was a tremendous disappointment for him. This reality became even more painful given that other members of Mr. Nunez' family continued with their education and are now enjoying the fruits of such pursuits.

For example, one of Mr. Nunez' brothers works as an accountant for Columbia University, another brother is a dentist, and two other brothers have lucrative jobs in the field of computer science. Observing the success of his siblings, living with the reality that he too could have enjoyed such success but for his misfortunate accident, and dealing with the daily struggle of providing for his family, has been a constant source of resentment, embarrassment, and difficulty for Mr. Nunez. Despite these personal feelings, Mr. Nunez has never let them interfere with what he sees as his obligation to provide for his wife and children, as well as his responsibility to be there for his siblings, and he has unequivocally, notwithstanding the instant offense, been an exceptional father, husband, and brother.[1]    No doubt, Mr. Nunez' limited education and ability to speak English presented substantial obstacles in finding suitable employment over the course of his life. Given this, he would often take whatever jobs were available in order to provide for his family. In an effort to compensate for his limited financial resources, he contributed to the family in other ways as well, such as caring for the children while his wife worked. In short, Mr. Nunez made the most of the opportunities available to him, and remained faithful to his commitment to family. However, the unyielding hardship of providing for his family combined with the opportunity that presented itself in the form of the illegal activity in this case simply proved too much of a temptation for Mr. Nunez, and in desperation he accepted the opportunity that presented itself. As mentioned, though, Mr. Nunez realizes his wrongdoing, and is truly remorseful for his conduct.

---

[1] Mr. Nunez acknowledges that he and his significant other, Brekis Bonsenor, have never legally married. PSR at ¶ 28. However, given that they have lived together the past ten years, and that Mr. Nunez considers her his common-law wife, the memorandum refers to Ms. Bonsenor as his wife.

- 4 -

Respectfully, Mr. Nunez requests the Court take these factors into consideration at sentencing.

Another significant fact of Mr. Nunez' case that warrants consideration is his inevitable deportation. Mr. Nunez is a lawful permanent resident and has lived in this Country for nearly fifteen years. In fact, Mr. Nunez' entire family resides in the United States, all within the tri-state area. His mother lives in New York City, his siblings all reside in the area, and most importantly, Mr. Nunez' wife and children live here. As mentioned above, this family is extremely close and visit with each other on a regular basis. More than just visit, the family members depend upon each other to help with the daily obstacles that are present for immigrants to this Country. This family unity is the most important thing in the world to Mr. Nunez, and he is undeniably devastated by the fact that he will be removed from this environment.

What makes his deportation all the more traumatic is that there is nothing for Mr. Nunez in his home country of the Dominican Republic. Indeed, it is a misnomer to even refer to it as his "home country," as the United States is truly his home. His children are here, his siblings are here, and his mother is here; there is no one for him in the Dominican Republic. Mr. Nunez has no idea how he will find work once deported, where he will live, or how he will see his family. Given this bleak prospect, it is not an overstatement to say that removing Mr. Nunez to the Dominican Republic is a greater punishment than any period of incarceration can achieve. It goes without saying that Mr. Nunez would gladly accept a longer prison sentence if it meant at the end that he could remain with his family here in this Country in exchange for his deportation. Knowing, however, that this is not a realistic possibility, Mr. Nunez does respectfully request that the Court take into consideration at sentencing the consequences of his unavoidable deportation in this case. While Mr. Nunez acknowledges that a defendant's prospective deportation generally may not form the basis of a downward departure, see United States v. Restrepo, 999 F.2d 640, 646 (2d Cit. 1993), the Court may consider this fact in determining an appropriate sentence in light of the government's motion pursuant section 5K1.1. See 18 U.S.C. § 3661 (stating that there shall be no limitation on the information a court "may receive and consider for the purpose of imposing an appropriate sentence.").

- 5 -

In sum, with his deportation Mr. Nunez will already experience a punishment much more severe than he ever would have imagined for his conduct. As mentioned, though, it did not take this expensive price to pay for Mr. Nunez a learn a vary valuable lesson. He is truly remorseful for his conduct, and from the moment of his arrest, even before he knew the possible consequences in this case, Mr. Nunez was making an effort to account for his wrongdoing. Respectfully referencing the Court's obligation to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing, see 18 U.S.C. § 3553(a), and taking into consideration the aforementioned factors, especially his inevitable deportation, Mr. Nunez respectfully requests a sentence of probation in this case. Such a sentence is appropriate for several reasons.

First, the sentence combined with Mr. Nunez' deportation reflects the seriousness of Mr. Nunez' conduct and promotes respect for the law. 18 .U.S.C. § 3553(a)(1). Second, the sentence achieves specific deterrence as there is no doubt Mr. Nunez will never again engage in such conduct given the price he has paid in terms of deportation. Third, Mr. Nunez has already proven his ability to meticulously abide by conditions of probation as he has flawlessly followed such conditions for the last eighteen months. Finally, a sentence of probation recognizes the overwhelming punitive effect of Mr. Nunez' deportation and would ensure that Mr. Nunez' overall sentence is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Thus, for all the reasons stated above, Mr. Nunez respectfully requests a sentence of probation.

Respectfully submitted,

THE DEFENDANT,
MIGUEL NUNEZ

THOMAS G. DENNIS
FEDERAL DEFENDER

/s/

Dated: November 8, 2004

Thomas P. Belsky
Asst. Federal Defender

- 6 -

               2 Whitney Ave., Suite 300
               New Haven, CT 06510
               Bar No. ct24770
               (203) 498-4200

## CERTIFICATION

  I HEREBY CERTIFY that a copy of the foregoing has been mailed to Mark Rubino, Assistant United States Attorney, P.O. Box 1824, New Haven, CT 06508, on this 8th day of November 2004.

_____
              Thomas Belsky